CASE NO. 22-1590
IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

_____

**DANIEL ALLEN AND CATHLEEN ALLEN,**

*Plaintiffs-Appellants,*

– v. –

**UNITED STATES OF AMERICA,**

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

_____

**BRIEF OF PLAINTIFFS-APPELLANTS
DANIEL ALLEN AND CATHLEEN ALLEN**

_____

Submitted by:

Beth M. Rivers (P33614)
Megan A. Bonanni (P52079)
Kevin M. Carlson (P67704)
Robert W. Palmer (P31704)
Michael L. Pitt (P24429)
Pitt, McGehee, Palmer, Bonanni & Rivers P.C.
Attorneys for Appellants Daniel and Cathleen Allen
117 West Fourth St., Suite 200
Royal Oak, MI 48067
Tel: 248-398-9800

## CORPORATE DISCLOSURE

Pursuant to 6th Cir. R. 26.1, Plaintiffs-Appellants make the following disclosure:

1. Are any of said parties a subsidiary or affiliate of a publicly owned corporation?

    NO.

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

    NO.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURES ................................................................. i

TABLE OF AUTHORITIES ................................................................ iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................................... ix

STATEMENT OF JURISDICTION ....................................................... x

STATEMENT OF ISSUES ................................................................ xii

STATEMENT OF THE CASE ............................................................. 1

STATEMENT OF FACTS ................................................................. 2

STANDARD OF REVIEW ................................................................ 8

SUMMARY OF THE ARGUMENT ....................................................... 9

ARGUMENT ................................................................................ 11

I.    Defendant is not immune from Plaintiffs' claim under Section 10(c) of the Federal Power Act, 16 U.S.C. § 803(c), because the statute only exempts the government from liability where a dam was "constructed under a [FERC] license" and here, the Edenville Dam was not constructed under a license ................................. 11

A. The Edenville Dam was not "constructed under a license," and therefore, the statutory exemption does not apply ......................... 11

B. The plain meaning of interpretation of the statute requires the conclusion that the Government is not exempt from the Plaintiffs' claims .................................................................. 13

C. The legislative history of 16 U.S.C. § 803(c) requires the conclusion that the Government is not exempt from liability in this case ........................................................................ 20

    i.   Legislative Purpose of Liability Provision of § 803(c) .................... 21

    ii.  Legislative History: Senate Origins ................................. 22

iii. Legislative History: House Overhaul ................................................ 23

iv. Proposed Graham Amendment ......................................................... 24

v.  Conference & Enactment ................................................................. 25

II.   But-for Defendant's act of negligent entrustment, the failure of the Edenville Dam could have been avoided, and because § 803(c) only exempts the Government from liability for actions in the "construction, maintenance, or operation" of the dam," there is nothing in § 803(c) that would provide immunity for Defendant's own independent, affirmative act of negligently entrusting the dam to Boyce .................................................................... 29

III.  The District Court erred in its application of canons of interpretation, and a plan and grammatically proper interpretation of the statute requires the conclusion that Defendant is not exempt from Plaintiff's claims ........................................................................................................... 31

CONCLUSION AND RELIEF REQUESTED .................................................... 43

# <u>TABLE OF AUTHORITIES</u>

## <u>Federal Cases</u>

*Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 222 (2008) ............................... 38

*Am. Int'l Grp., Inc. v. Bank of Am. Corp.*,
712 F.3d 775, 782 (2d Cir. 2013) .......................................................... 16

*Arizona v. Inter-Tribal Council of Arizona, Inc.,* 133 S.Ct. at 2256-56 .............. 38

*Atlantic Cleaners & Dryers v. United States*, 286 U.S. 427, 433 (1932) ............. 35

*Beaunit Corp. v. Alabama Power Co.*,
370 F. Supp 1044, 1051 (N.D. Ala. 1973) ...................................................... 24, 28

*California Edison*, 413 F. Supp. 2d at 1110 ......................................................... 17

*Caminetti v. United States*, 242 U.S. 470, 485 (1917) .......................................... 14

*Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992) ............... 14, 19, 31

*Demarest v. Manspeaker*, 498 U.S. 184, 185 (1991) .......................................... 39

*DiLarau v. Power Auth. Of State of N.Y.*,
982 F.2d 73, 78 (2nd Cir. 1992) .............................................................. 23

*Facebook Inc. v. Duguid*, 141 U.S. 1163 (2021) ...................................... 32, 34-35

*FDIC v. Meyer*, 510 U.S. 471, 476 (1994) .......................................................... 19

*Flora v. United States*, 362 U.S. 145 (1960) ...................................................... 15

*Flores-Figueroa v. United States*, 556 U.S. 646 (2009) ...................................... 16

*Gentek Bld. Prods., Inc. v. Sherwin-Williams Co.*,
491 F.3d 320, 330 (6th Cir. 2007) ............................................................. 9

*Great N. Paper, Inc.*, 97 FERC 61204, 61894 (2001) .......................................... 17

iv

*Green v. Bock Laundry Machine Company*,
490 U.S. 504, 527 (1989) (Scalia, J., concurring) ................................................ 42

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*,
530 U.S. 1, 6 (2000) ............................................................................................ 14

*Kungys v. United States*, 485 U.S. 759, 778 (1988)
(Scalia, J., plurality opinion) ................................................................................ 18

*Lake Ontario Land Dev. & Beach Protection Ass'n v. FPC*,
212 F.2d 227, 232 (D.C. Cir. 1954) ...................................................................... 17

*Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004) .................................. 14

*Larry E. Parrish P.C. v. Bennett*, 989 F.3d 452, 455 (6th Cir. 2021) ................... 9

*Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1985) ...................................................... 17

*Moskal v. United States*, 498 U.S. 103, 109 (1990) ............................................. 18

*Mynatt v. United States*, 45 F.4th 889, 893, 895 (6th Cir. 2022) .................... 9, 11

*New York Power Authority*, 98 FERC 61,033, 61,095 (2002) ............................. 17

*Pac. Gas & Elec. Co. (PG&E) v. FERC*,
720 F.2d 78, 87 (D.C. Cir. 1983) .......................................................................... 42

*Pike Rapids Power Co. v. Minneapolis, St. Paul & Sault St. Marie Ry.*,
99 F.2d 902, 912 (8th Cir. 1938) .......................................................................... 42

*S.C. Pub. Serv. Auth. V. F.E.R.C.*,
850 F.2d 788, 793 (D.C. Cir. 1988) ............................................................20, 26-28

*Simmons v. Sabine River Auth. Louisiana*,
732 F.3d 469, 477 (5th Cir. 2013) ........................................................................ 36

*Skokomish Indian Tribe v. United States*,
410 F.3d 506, 511-12 (9th Cir. 2005) ..........................................................14-15, 30

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
508 U.S. 439, 454 (1993) .......................................................................... 32

*United States v. Kaluza*, 780 F.3d 647, 658 (5th Cir. 2015) ................................. 14

*Wolverine Power Co. v. F.E.R.C.*,
963 F.2d 446, 447 (D.C. Cir. 1992) ................................... 12, 19, 26, 28

## State Cases

*Baker v. General Motors Corp.*, 409 Mich 639, 665 (1980) ............................... 12

## Statutes

16 U.S.C. §§ 791-823(d) ............................................................. 12(fn3)
16 U.S.C. § 796(a)(10) .................................................................. 19
16 U.S.C. § 797 ................................................................... 11, 15
16 U.S.C. § 797(a)(12) .................................................................. 17
16 U.S.C. § 797(e) ................................................................ 17, 19
16 U.S.C. § 803(b) ...................................................................... 19
16 U.S.C. § 803(c) ................................................................*passim*
16 U.S.C. § 803(e) ...................................................................... 19
16 U.S.C. § 803(f) ...................................................................... 19
16 U.S.C. § 809 ......................................................................... 19
16 U.S.C. § 816 ......................................................................... 19
16 U.S.C. § 817 ................................................................... 11, 15

## Other Authority

H.R. Rep. No. 65-715 at 6, 14, Ex. A (June 28, 1918) ......................................... 23

H.R. Rep. No. 65-1147 at 16 (Feb. 26, 1919) ............................................... 21, 25

Public Law 280, 66th Cong. Sess. 2 (Sept. 12, 1919) ......................................... 26

S. 1419, 65th Cong. 1st Sess., § 4 (Apr. 9, 1917) .............................................. 22

S. 1419, 65th Cong. 1st Sess., § 4 (Dec. 13, 1917) (Ordered Printed
Showing Changes from S. 3331, as Passed in 64th Congress) ............................... 22

S. 1419, 65th Cong. 2nd Sess., § 4 (Dec. 15, 1917) ............................................. 22

S. 1419, 65th Cong. 2nd Sess. (Sept. 4, 1918) ..................................................... 25

S. 1419, 65th Cong. 2nd Sess. (Feb. 26, 1919) ..................................................... 25

S. 3331 .................................................................................................................. 22

S. Rep. No. 65-179 (Dec. 12, 1917) .................................................................... 22

S. Rep. No. 66-180, p. 14 (Sept. 12, 1919) ......................................................... 26

56 Cong. Rec. 9109-10, 9913-16 (Sept. 3, 1918) ............................................... 28

56 Cong. Rec. 9913-16 (Sept. 3, 1918) ................................................. 24, 27, 37

59 Cong. Rec. 245 (December 6, 1919) ....................................................... 21(fn5)

82 C.J.S. Statutes § 427 ....................................................................................... 15

GRAMMAR CANNON *in* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS at 140 (2012) ..................... 16, 34

PRESUMPTION OF CONSISTENT USAGE *in* READING LAW at 170 ........ 19

SERIES-QUALIFIER CANON *in* READING LAW at 147 ............................. 16

SURPLUSAGE CANON *in* READING LAW at 174 ...................................... 17

SURPLUSAGE CANON *in* READING LAW at 176 ...................................... 18

The Princeton Review, *Grammar Smart: A Guide to Perfect Usage* *66* (2d ed. 2001) .................................................................................................. 33

2A N. Singer & S. Singer, *Sutherland Statutes and Statutory Construction*, § 47:33, pp. 499-500 (rev. 7th ed. 2014) ...................................... 34

Tyler Harden, *Limiting Tribal Rights Under the Federal Power Act: Skokomish Indian Tribe v. United States*, 28 Energy L.J. 667, 679 (2007) ......... 14

W. Eskridge, *Interpreting Law: A Primer on How to Read Statutes and the Constitution*, 67-68 (2016) ....................................................... 34

Webster's New Word English Grammar Handbook 222 (2d ed. 2009).......... 32-33

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiffs-Appellants request oral argument in this matter pursuant to Federal Rules of Appellate Procedure 34(a) and Sixth Circuit Rule 34. This case involves an issue of statutory interpretation and the scope of Defendant's sovereign immunity asserted against claims brought under the Federal Tort Claims Act. The trial court's analysis of the issue of immunity, and of the controlling statutory language, is set forth in two written opinions. Oral argument would assist the Court in analyzing the statutory language and will allow the Court and counsel an opportunity to review in more detail any questions raised by the briefs or in the record.

## STATEMENT OF JURISDICTION

This case, initially filed in the United States District Court for the Eastern District of Michigan, alleges that Defendant United States of America, through the Federal Energy Regulatory Commission (FERC), negligently entrusted the operation of the Edenville Dam to an owner and operator which it knew was incapable of safely operating a hydroelectric dam. (R. 1, Complaint, Page ID # 1 - 24). FERC entrusted the operation of the Dam to the owner and operator without fulfilling its mandatory preapproval duties, and despite knowing that the owner and operator was not fit to safely operate the Dam. *Id*. Plaintiffs brought their claims against the United States under the Federal Tort Claims Act. *Id*.

Jurisdiction is based on 28 U.S.C. §1331, which provides that the District Court has original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the Unites States, as well as 28 U.S.C. §1346(b), which provides that the District Court has exclusive jurisdiction of civil actions on damages claims against the United States.

Appellate Jurisdiction is conferred by 28 U.S.C. § 1291, which states that the Court of Appeals shall have jurisdiction of appeals from "all final decisions of districts courts of the United States[.]"

The District Court granted Defendant's Motion to Dismiss on November 16, 2021. (Opinion & Order, R. 28, Page ID # 279 - 304). Plaintiffs-Appellants filed a

timely motion for reconsideration on November 30, 2021. (Motion for Reconsideration, R. 30, Page ID # 306 - 332). The District Court denied the motion for reconsideration on June 8, 2022. (R. 31, Opinion and Order, Page ID # 333 - 344). Plaintiffs filed a timely notice of appeal on July 1, 2022. (R. 32, Notice of Appeal, Page ID # 345 - 346). In this appeal, Plaintiffs challenge the District Court's Opinion and Order granting Defendant's motion to dismiss (R. 28) and the District Court's Opinion and Order denying Plaintiffs' motion for reconsideration (R. 31).

## STATEMENT OF ISSUES

Defendant United States of America, through the Federal Energy Regulatory Commission (FERC), entrusted the operation of the Edenville Dam to an owner and operator which it knew was incapable of safely operating a hydroelectric dam. FERC entrusted the operation of the Dam to the owner and operator without fulfilling its mandatory preapproval duties, and despite knowing that the owner and operator was not fit to safely operate the Dam. Does Section 803(c) Federal Power Act confer absolute immunity for Defendant's own acts of negligent entrustment?

Plaintiffs-Appellants answer:    No.

Defendant-Appellee answers:    Yes.

## STATEMENT OF THE CASE

Plaintiffs filed this action in the United States District Court for the Eastern District of Michigan on February 26, 2021. (R. 1, Complaint, Page ID # 1- 24). Plaintiffs brought their complaint against the Defendant United States of America under the Federal Tort Claims Act. *Id*. Plaintiffs allege that Defendant is liable for the tort of negligent entrustment because it negligently entrusted the operation of the Edenville Dam to Boyce Hydro Power LLC ("Boyce") without fulfilling its mandatory duty to first determine that Boyce was fit to safely operate the Dam, and despite knowing that Boyce was not fit to safely operate the Dam. *Id*.

On November 16, 2021, the District Court issued an Opinion and Order granting Defendant's motion to dismiss. (Opinion & Order, R. 28, Page ID # 279 - 304). Plaintiffs-Appellants filed a motion for reconsideration on November 30, 2021. (Motion for Reconsideration, R. 30, Page ID # 306 - 332). The District Court denied the motion for reconsideration on June 8, 2022. (R. 31, Opinion and Order, Page ID # 333 - 344). Plaintiffs filed a timely notice of appeal on July 1, 2022. (R. 32, Notice of Appeal, Page ID # 345 - 346). In this appeal, Plaintiffs challenge the District Court's Opinion and Order granting Defendant's motion to dismiss (R. 28) and the Opinion and Order denying Plaintiff's motion for reconsideration (R. 31).

## STATEMENT OF FACTS

The Edenville Dam is one of four dams built in 1924 to generate hydroelectricity. (R. 1, Complaint ¶17, Page ID # 7). The Edenville Dam was constructed in two embankments across the Tittabawassee and Tobacco Rivers and it formed 2600-acre reservoir, Wixom Lake. *Id*. at ¶21. The other dams in the group are the Sanford, Smallwood, and Secord Dams. *Id*. at ¶19. All four dams are earthen embankments with concrete spillways. *Id*. ¶20.

The FERC license to operate the dams was held initially by Wolverine Power Corporation. (R. 1, Complaint ¶8, Page ID # 5). Wolverine also owned the property on which the dams were located. *Id*. The real estate assets of Wolverine were obtained by Synex Energy in a foreclosure proceeding in 2003. (R. 1, Complaint ¶12, Page ID # 6). Those assets were transferred to a new subsidiary, Synex Michigan, LLC, in June 2004. *Id*. FERC followed its mandatory pre-approval transfer for the Synex acquisition and approved the transfer of the licenses based on a finding that Synex was qualified to hold the licenses and operate the properties because Synex had been developing hydropower projects in British Columbia since 1984. (R. 20-2, FERC order, Page ID # 180- 184).

On March 17, 2006, Boyce purchased the interests of Synex Michigan. (R. 1, Complaint ¶14, Page ID #6, and R. 20-3, Order Revoking License, Page ID # 188 & n 11). Synex then changed its name to Boyce Hydro Power, LLC and filed a

statement with FERC confirming the name change on June 12, 2007. (R. 1, Complaint ¶15, Page ID # 6). Boyce was owned by Lee Mueller and his relatives, who had no experience operating dams or hydroelectric projects, but bought the dams as a tax shelter. (R. 1, Complaint ¶24, Page ID # 8). Unlike the pre-approval process that was followed when Synex acquired the dams out of foreclosure, FERC did not follow the mandatory process to evaluate and ensure Boyce's financial ability, skill set, or will to manage and operate the dams in 2006 when the sale occurred. (R. 1, Complaint ¶49, ¶¶53-55, Page ID # 15-16).

After purchasing the dams, Boyce ignored demands from FERC to correct compliance failures first identified in 1999. (R. 1, Complaint ¶23, Page ID #8). Of primary concern was the need to increase the capacity of the spillway to pass the Probable Maximum Flood (PMF), which is the flood that might be expected from the most severe combination of meteorological and hydrologic conditions. (R. 1, Complaint ¶¶34-36, Page ID # 10-11). Boyce repeatedly missed promised deadlines for the design and construction of the spillway, claiming it did not have money to complete the construction and was unable to borrow the necessary funds. (R. 1, Complaint ¶¶29-30, 37, 58, 65, Page ID # 9, 11, 17-18). Yet FERC continued to grant Boyce extensions. (R. 20-3, Order Revoking License. Page ID # 186-215). Finally, after more than a decade of missed deadlines and broken promises, FERC

issued a compliance order on June 15, 2017, outlining the history of violations. (R. 1, Complaint ¶35, Page ID #10).

Again, Boyce sought several extensions, but never took the steps to satisfy the 2017 compliance order. (R. 20-3, Order Revoking License. Page ID # 186-215). FERC thus issued a cease generation order, which was stayed by the D.C. Circuit in February 2018. *Id*. Th order from the D.C. Circuit allowed Boyce to resume generation and energy sales. *Id*. Thus, after issuing the license and entrusting the operation of the dam to Boyce, FERC knew Boyce was recalcitrant in its repeated refusal to take action to protect the public. R. 1, Complaint ¶48, Page ID # 14-15.

FERC then issued an order proposing revocation of Boyce's license to operate the Edenville project. (R. 20-3, Order Revoking License. Page ID # 186-2). FERC concluded that Boyce had knowingly and willfully refused to comply with major aspects of its license and FERC's regulatory scheme, "with the result that public safety has been put at risk and the public has been denied the benefits, particularly project recreation, to which it is entitled." *Id*. Given the record of "obfuscation and outright disregard of its obligations," FERC revoked Boyce's license on September 10, 2018. *Id*.

Upon revocation, jurisdiction over the Edenville Dam passed to Michigan's Department of Environmental, Great Lakes and Energy (EGLE). (R. 1, Complaint ¶39, Page ID #12). Because FERC retained jurisdiction over the three related dams,

FERC and the State of Michigan had joint jurisdiction over the four dam projects until the disaster. *Id*. at ¶40.

On May 19, 2020, the Edenville Dam failed, resulting in catastrophic flooding. (R. 1, Complaint ¶41, Page ID # 12). The downstream Sanford Dam suffered overtopping damage and then breached, causing areas further downriver to be flooded. *Id*. Thousands of individuals had to evacuate. *Id*. at ¶42. Thousands of others suffered extensive damage to their homes as well as their real and personal property. *Id*.

This disaster and the catastrophic consequences suffered by the Plaintiffs were entirely preventable. FERC indisputably knew for years that Boyce never should have been licensed in the first place and that these Dams were unstable, unsafe, and would fail under predictable conditions. Thus, but-for the government's decision to entrust the Dam to the ownership of Boyce, the disaster could have been avoided. As the District Court recognized, Defendant should have followed the mandatory pretransfer investigation and approval process before entrusting the dam to Boyce, but failed to do so:

> In a June 2020 letter to Congress, FERC Chairman Neil Chatterjee claimed that FERC never investigated Boyce's financial capacity, as Boyce "had acquired the project assets from Wolverine through a foreclosure sale, which is an exception to the . . . otherwise applicable requirement that the Commission pre-approve a transfer." See Letter from Neil Chatterjee, Chairman, FERC, to Frank Pallone, Chairman, H. Comm. on Energy and Com., at 2–3 (June 18, 2020). Chairman Chatterjee was presumably referring to 16 U.S.C. § 801, which exempts

transfers by "mortgage or trust deed or judicial sale[]" from the preapproval process. But Chairman Chatterjee's explanation seems inconsistent with FERC's earlier commentary. Indeed, in its 2004 order approving the transfer, FERC seemed to state that the transfer should have been subject to preapproval:

> While it appears that Synex Energy lawfully obtained (without prior Commission approval) project property and perhaps the project licenses in foreclosure proceedings, it also appears that Synex Energy's assignment of title to project property and its asserted sale of licenses to Synex Michigan required prior Commission approval. However, the record shows that the parties failed to obtain such approvals inadvertently. Wolverine Power Corp. Synex Energy Res., Ltd. Synex Mich., LLC, 107 FERC ¶ 62,266, at p. 64,498 n.4 (2004) (emphasis added).

> To date, FERC has offered no explanation for the apparent contradiction. [R. 28, Opinion and Order, PageID.281]

In sum, FERC had a mandatory duty to follow a pre-approval assessment process to determine whether Boyce was a financially viable and capable operator to whom the operation of the Edenville Dam could be entrusted. FERC followed this process when Synex acquired the Dam from Wolverine through foreclosure proceedings. By its own admission, FERC did not fulfill this mandatory duty when Boyce acquired the Dam.

FERC's failure to ensure that Boyce could properly operate the Dam before issuing a license proved to be catastrophic. According to a recent forensic report: "For the three decades under FERC regulation, the IFT concluded that none of the three dam owners appeared to have had sufficient funds to upgrade the spillway capacity to meet FERC requirements. As a regulator during this period, FERC had

discretion to formally evaluate the financial capacity of the dam owners, however FERC's position and practice was that the mandate to enforce its safety regulations was not dependent on a licensee's financial capacity, and licensees were expected to comply regardless of the costs. FERC typically evaluated the financial capacity of owners during initial licensing and during subsequent license transfer processes, but not typically during the term of a license." IFT Report, p. 127-29.[1]

Furthermore, FERC's initial decision to license the Dam to a negligent operator made its eventual revocation of the license inevitable, with revocation of the license contributing to the failure of the dam in May 2020. "FERC was trying to compel the dam owners to complete spillway upgrades at Edenville Dam to accommodate the PMF, while the owners claimed to have insufficient financial resources to support the upgrades. None of FERC's enforcement options would help this situation, and, in fact, they all would make the situation worse by reducing the owners' revenue. The action ultimately taken by FERC, license revocation, did not reduce the risks presented by Edenville Dam." IFT Report, p. S-8. "It turned out that the license revocation had a net negative effect from a dam safety standpoint because it had the same effects as ordering the dam owner to cease generating power, namely elimination of about half of the revenue from the four dams and loss of the ability to

---

[1] The Full IFT Report is available at: https://damsafety-prod.s3.amazonaws.com/s3fs-public/files/Edenville-Sanford_Final%20Report_Main%20Report%20and%20Appendices.pdf

release up to 2,000 cf. of water through the powerhouse. The IFT found that if it had been possible to release water through the powerhouse during the May 2020 event, the lake level would have been lowered by up to about 0.8 foot, which may or may not have prevented the embankment instability failure." IFT Report, p. 127-29.

FERC knew for years that Boyce never should have been licensed in the first place, but it "did not order cessation of power generation, lake level restrictions, or license revocation, nor did FERC threaten to do so." IFT Report, p. 86.

The damages suffered by Plaintiffs were the direct and foreseeable result of the FERC's breach of its mandatory duty to ensure that Boyce had the capacity and will to "manage, operate, and maintain the project safely" before transferring the license. *Id*. at ¶49, citing 16 U.S.C.§ 808(2). The disaster is also the direct and foreseeable consequence of FERC's breach of its mandatory duty not to license, or to allow a license to continue, when it judges that the project is not best adapted to a comprehensive plan for flood control. *Id*. at ¶50.  FERC failed in this mandatory duty by allowing Boyce to maintain its license long after determining that Boyce did not satisfy those standards. *Id*.

## STANDARD OF REVIEW

In dismissing Plaintiffs' Complaint, the District Court interpreted Section 10(c) of the Federal Power Act, 16 U.S.C. § 803(c), to "exempt[] the Government from liability for Plaintiffs' damages" and therefore dismissed Plaintiffs' Complaint

for lack of subject matter jurisdiction. (R. 28, Opinion and Order, Page ID # 303). The Court of Appeals reviews this conclusion de novo. *Mynatt v. United States*, 45 F.4th 889, 895 (6th Cir. 2022)(citing *Larry E. Parrish P.C. v. Bennett*, 989 F.3d 452, 455 (6th Cir. 2021)). In this procedural posture, the Court of Appeals must take as true the facts alleged in Plaintiffs' Complaint. *Mynatt*, 45 F.4th at 893 (citing *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007)).

## SUMMARY OF THE ARGUMENT

Plaintiffs brought their complaint under the Federal Tort Claims Act, which "broadly waives sovereign immunity for tort claims against the United States, but also claws back that immunity in several instances by stating exceptions." *Mynatt*, 45 F.4th at 893. In its motion to dismiss (R. 15, Motion, Page ID # 53-84), the Government argued (1) it was immune from Plaintiff's claims under the exemption set forth in the Section 10(c) of the Federal Power Act; (2) it was immune under the discretionary function exception to the Federal Tort Claims Act, and (3) that Plaintiff could not state a claim for relief because they failed to allege a breach of duty that would apply to a private person under Michigan tort law.

The District Court dismissed the case only on the grounds that Section 803(c) exempted the government from liability. The District Court did not address the Government's other arguments – discretionary function and failure to state a claim -- and those arguments are not presented to this Court on appeal. The only issue

presented on appeal is whether the District Court erred in finding that Defendant is immune from Plaintiffs' claims under the exemption set forth in Section 10(c) of the Federal Power Act, 16 U.S.C. 16 U.S.C. § 803(c).[2]

The District Court dismissed this case for lack of subject matter jurisdiction based on its finding that Plaintiffs' allegations of negligent entrustment under the Federal Tort Claims Act failed to overcome the government's sovereign immunity. (R. 28, Opinion and Order, Page ID # 303). The District Court interpreted Section 10(c) of the Federal Power Act, 16 U.S.C. § 803(c), to "exempt[] the Government from liability for Plaintiffs' damages," despite the fact that the language of the statute only exempts the government from liability when the dam was "constructed under the [FERC] license." 16 U.S.C. § 803(c).

The District Court erred in finding that the government was exempt from liability because the Edenville Dam was not "constructed under the license" and thus the statutory exemption, by its plain language, does not apply. Furthermore, the District Court's finding was in error because Plaintiffs' claim is based on the Government's own action of entrusting the operation of the Dam to Boyce in the first instance, and not on acts taken in the construction, maintenance, or operation of

---

[2] Because the District Court did not consider the other bases on which Defendant sought summary judgment, Plaintiffs have not addressed those arguments in this brief. However, Plaintiffs believe those issues, specifically the application of the discretionary function defense, would be resolved in Plaintiffs' favor.

the dam, which would arguably bring the Government's conduct within the scope of the exemption set forth in 16 U.S.C. § 803(c).

This Court should reverse the District Court's judgment and remand the case for further proceedings, including consideration of the government's other asserted grounds for dismissal. *See Mynatt v. United States*, 45 F.4th 889, 899 (6th Cir. 2022).

## ARGUMENT

**I.**    **Defendant is not immune from Plaintiffs' claim under Section 10(c) of the Federal Power Act, 16 U.S.C. 16 U.S.C. § 803(c), because the statute only exempts the government from liability where a dam was "constructed under a [FERC] license" and here, the Edenville Dam was not constructed under a license.**

### A.    The Edenville Dam was not "constructed under a license," and therefore the statutory exemption does not apply.

The District Court erred in finding that FERC is immune from Plaintiffs' claims under Section 10(c) of the Federal Power Act, 16 U.S.C. § 803(c). The Act authorizes FERC to license and regulate certain hydropower plants. 16 U.S.C. §§ 797, 817. The Act conditions licenses upon the licensees' acceptance of the terms and obligations enumerated in § 10. 16 U.S.C. § 803. Section 10(c) provides: "[e]ach licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, ***constructed under the license***, and in no event shall the United States be liable therefor." 16 U.S.C. § 803(c) (emphasis

added). Thus, if the works are constructed under the license, then the licensee is liable, and the Government is not.

Here, FERC is not immune under Section 10(c) of the Federal Water Power Act[3] because the plain text and legislative intent of § 10(c) restrict its provisions to "project works...constructed under [a] license" and the Edenville Dam was not "constructed under [a] license." The facts supporting this conclusion are clear and undisputed. The Edenville Dam was constructed in 1925 without a license and operated without a license for decades. *Wolverine Power Co. v. F.E.R.C.*, 963 F.2d 446, 447 (D.C. Cir. 1992). Only in 1976 did the Federal Power Commission (FERC's predecessor) redesignate the river as a navigable waterway and order the Dam's owner to obtain a license. *See id.* Because it was not "constructed under a license," the Edenville Dam is not subject to the liability provisions of § 10(c), and FERC is not exempt from Plaintiff's claims arising from the Dam's failure.

To hold that the Government is immune in cases where the works were not constructed under the license would render that statutory language meaningless, since the Government would be immune regardless of whether the works were constructed under the license. *Baker v. Gen. Motors Corp.*, 409 Mich 639, 665

---

[3] Today, the FWPA is Part I of the Federal Power Act codified in 16 U.S.C. Chapter 12, Federal Regulation and Development of Power, Subchapter I-Regulation of the Development of Water Power and Resources (§§ 791—823(d)).

(1980) ("Every word of a statute should be given meaning and no word should be treated as surplusage or rendered nugatory if at all possible.")

FERC publishes licensing requirements which confirm that whether a dam has been constructed under a license (and whether immunity may apply) is not a distinction without a difference. FERC maintains rigorous application requirements to ensure the suitability of the applicant; the function and safety of the project; and to protect stakeholders, the community, and the environment.[4] These licensing requirements demonstrate why the immunity provisions of the Act are limited to protecting the government from liability only where the dam was "constructed under the license" because in cases where the dam is constructed under a license, the government has applied the rigorous application requirements, thus providing a reason to shelter the government from liability. On the other hand, where the government is not involved in licensing a dam for its construction, there is no comparable justification for its immunity.

**B.    The plain meaning interpretation of the statute requires the conclusion that the Government is not exempt from the Plaintiffs' claims.**

A plain reading of the statute requires the conclusion that the Government is not exempt from Plaintiffs' claims. The starting point for interpreting a statutory

---

[4] See: https://www.ferc.gov/licensing

13

provision is the plain meaning of its words. *Lamie v. United States Trustee*, 540 U.S. 526, 534 (2004); The Court may look beyond the words to legislative history or canons of interpretation only if the words are ambiguous or if their plain meaning leads to absurd results. *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992). Otherwise, the Court must enforce the provision as written. *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000). A provision is ambiguous if it is "susceptible to more than one reasonable interpretation." *United States v. Kaluza*, 780 F.3d 647, 658 (5th Cir. 2015); *accord Caminetti v. United States*, 242 U.S. 470, 485 (1917). A provision's plain meaning leads to "absurd results" if it "produce[s] result[s] demonstrably at odds with the intentions of its drafters." *Lamie*, 540 U.S. at 536-38.

The interpretation of the phrase "constructed under the license" in § 10(c) is a matter of first impression in the federal courts. Only one case has implicated a claim against FERC in connection with damages caused by a hydropower plant originally constructed without a license. *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 511–12 (9th Cir. 2005). Although *Skokomish* held that FERC was immune from the Tribe's claims, neither party raised the fact that the hydropower plant at issue was constructed in the 1920s and operated for decades without a project license until 1998. *See* Tyler Harden, *Limiting Tribal Rights Under the Federal Power Act: Skokomish Indian Tribe v. United States*, 28 Energy L.J. 667, 679 (2007).

14

Thus, the Ninth Circuit's decision was made without any discussion, let alone interpretation, of § 10's "constructed under the license" clause. *See Skokomish*, 410 F.3d at 511-12.

Section 10(c) of the FWPA, codified in 16 U.S.C. § 803(c), is part of an integrated statutory scheme for the development and regulation of the nation's waterpower capacity. The Act authorizes FERC to license and regulate certain hydropower plants. 16 U.S.C. §§ 797, 817. As a baseline, the Act conditions "licenses upon the licensee" acceptance of the terms and obligations enumerated in § 10. 16 U.S.C. § 803. Section 10(c) provides: "[e]ach licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, **constructed under the license**, and in no event shall the United States be liable therefor." 16 U.S.C. § 803(c) (emphasis added).

This text makes plain that the "damages" for which licensees must accept liability, and from which the United States is immune, are those arising from "project works" or "works appurtenant or accessory thereto" that are "constructed under the license" being conditioned. *Id.*

This definition of "damages" is required by the basic grammatical relationship between the phrase "constructed under the license" and the rest of the provision. 82 C.J.S. Statutes § 427 (citing *Flora v. U.S.*, 362 U.S. 145 (1960)) ("Courts apply the

ordinary rules of grammar and common usage to ascertain the meaning of a statute."); *See also* GRAMMAR CANNON *in* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS at 140 (2012) ("Words are to be given the meaning that proper grammar and usage would assign them.").

When, like here, there is a straightforward parallel construction involving nouns or verbs in a series ("of project works or of works appurtenant or accessory thereto"), a postpositive modifier "normally applies to the entire series." *See* SERIES-QUALIFIER CANON *in* READING LAW at 147. Moreover, in § 10(c), the adjectival clause is separated from its antecedents by a comma, demonstrating that the phrase "constructed under the license" modifies all antecedent phrases. *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 782 (2nd Cir. 2013). Such separation is an affirmative "indication" of the "writer's intent" for the modifier to "apply to the entire list," especially where the list, like § 10(c)'s, does not follow a strict parallel structure. *Id.*

The only reasonable reading of § 10(c) is to apply the adjectival phrase "constructed under the license" to both "project works" and "works appurtenant or accessory thereto." *Cf. Flores-Figueroa v. United States*, 556 U.S. 646 (2009) (relying on extended and technical examination of grammatical structure to interpret criminal law's *mens rea* requirement).

16

A narrower interpretation that applies the adjectival clause only to its nearest antecedent, "works appurtenant or accessory thereto," would defy the rules of grammar and usage, and make the adjectival clause into "mere surplusage." *Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1985) *see also* SURPLUSAGE CANON *in* READING LAW at 174 ("If possible, every word and every provision is to be given effect. None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

The FPA limits FERC's licensing authority to "issuing licenses . . . for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works." 16 U.S.C. § 797(e); *see also, Lake Ontario Land Dev. & Beach Protection Ass'n, v. FPC*, 212 F.2d 227, 232 (D.C. Cir. 1954) The Act defines "project works" as "the physical structures of a project." 16 U.S.C. § 797(a)(12). Only facilities that meet this definition of "project works" are within FERC's jurisdiction and may be licensed. 16 U.S.C. § 797(e); *see also, California Edison*, 413 F. Supp. 2d at 1110; *New York Power Authority*, 98 FERC 61,033, 61,095 (2002) ("If a project work does not meet the definition [of project works under the Act], it is not subject to [FERC's] jurisdiction and therefore does not belong in the project license."); *Great N. Paper, Inc.*, 97 FERC 61204, 61894 (2001) ("[No] provision of Part I of the FPA gives the

Commission any authority over works that are not hydropower project works, as defined in FPA [§] 3(11)).

Thus, interpreting § 10(c)'s adjectival clause to modify "works appurtenant or accessory" but not "project works" would give the adjectival clause "an effect already achieved" by the FWPA's limits on FERC's licensing authority — making it "entirely redundant." *See* Surplusage Canon *in* Reading Law at 176 (quoting *Kungys v. United States*, 485 U.S. 759, 778 (1988) (Scalia, J., plurality opinion). By contrast, the more natural reading of the adjectival clause to modify both "project works" and "works appurtenant or accessory thereto" gives the clause the "independent effect" Congress intended. *Id.* The latter is preferred. *Moskal v. United States*, 498 U.S. 103, 109 (1990).

Given the foregoing, the meaning of § 10(c)'s "constructed under the license" clause is plain from the statutory text and reasonable in its context. The provision directly restricts the federal government's liability shield under § 10(c) to damages arising from "project works and works appurtenant or accessory thereto . . . constructed under [a] license." The verb "constructed" in this context — dealing, as it is, with dams, reservoirs, and power stations — is in no way ambiguous. *See* Construct, Merriam-Webster Dictionary Online ([https://bit.ly/3ixi1VP](https://bit.ly/3ixi1VP)) ("construct" means "to make or form by combining or arranging parts or elements" when used in the phrase "construct a bridge"); *see also FDIC v. Meyer*, 510 U.S.

18

471, 476 (1994) ("When a word is not defined by a statute, we normally construe it in accordance   with its ordinary or natural meaning."). Congress referred to the various activities of "constructing," "maintaining," *and* "operating" in different parts of the FWPA instead of *just* "constructing." 16 U.S.C. § 803(c).Congress's choice of the verb "construct" alone in the adjectival clause and other parts of the FWPA that refer to building or erecting structures (*see, e.g.*, 16 U.S.C. §§ 796(a)(10), 803(b), (e), (f), 816), but a combination of the verbs "construct," "maintain," and "operate" elsewhere in the FWPA to refer to a broader spectrum of activities (*see, e.g.*, 16 U.S.C. §§ 797(e), 803(c), 809), is highly indicative. *See* PRESUMPTION OF CONSISTENT USAGE *in* READING LAW at 170 ("A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning."). It "demonstrates that Congress knew how to draft" a provision encompassing activities other than "construction" when that was its intention. *See Wolverine Power*, 963 F.2d at 451.

The law is clear that canons of interpretation, like legislative history, should only be resorted to after grammatical and definitional analysis of the statute demonstrates that it is susceptible to more than one reasonable interpretation. *See, e.g., Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992). "When the words of a statute are unambiguous, judicial inquiry is complete." *Germain*, 503 U.S. at 254. As the language of Section 10(c)'s liability provisions are clear, no further

analysis of legislative intent is required. *S.C. Pub. Serv. Auth. v. F.E.R.C.*, 850 F.2d 788, 793 (D.C. Cir. 1988). Here, the statute is clear, and the Government is not immune from Plaintiffs' claims. But because the District Court analyzed the legislative history of the FPA in finding that the Government is exempt, Plaintiffs analyze the legislative history of the statute below.

### C. The legislative history of 16 U.S.C. § 803(c) requires the conclusion that the Government is not exempt from liability in this case.

The legislative history of § 803(c) confirms that its provisions were intended to preserve liability claims against private operators even when they obtain licenses from FERC, and not to confer immunity to the United States for its own affirmative acts of negligent entrustment, which arise independently from the acts of "construction, maintenance, and operation" that are the subject of the statute. The District Court erred in its analysis of "legislative history and other 'extra-textual sources' to ascertain" the meaning of § 803(c). R. 28, Opinion and Order, Page ID # 297. As the Court recognized, in their response to Defendant's motion to dismiss, "Plaintiffs [did] not address Graham's amendment, the Conference Report, or any other part of § 803(c)'s legislative history." ECF No. 28, PageID.300. As Plaintiffs argued in their motion for reconsideration, however, a full analysis of the legislative history demonstrates that the exception in the statute is restricted to "project works… constructed under [a] license" granted pursuant to the Act.

20

### i.    Legislative Purpose of Liability Provision of § 803(c).

The liability provision of § 803(c) originated out of a concern that licensees might avoid paying compensation for the damages caused by their hydropower projects, either by claiming immunity because of their federal license, offloading their liability onto the federal government, or simply engaging in dilatory litigation tactics. As the bill made its way through the legislative process, the language of § 803(c)changed several times, but there is ample indication that it was always intended to accomplish the same purpose: "to provide that the licensee shall pay all damages caused to the property of others." *See* H.R. Rep. No. 65-1147 at 16 (Feb. 26, 1919). Nothing in its legislative history suggests § 803(c) was intended, or even contemplated, to create a general-purpose water-power immunity for the federal government (and certainly not for licensees).[5] And Congress's affirmative rejection of several drafting options that *failed to* include "constructed under the license" limitations — and reversion to options that *did* include them — suggests this language reflects Congress's reasoned decision as to § 803(c)'s limited applicability.

---

[5] Only one passing comment — made by Mr. Jones during his summarization of the bill during Senate debate on H.R. 3184 — even mentions the liability provision of § 803(c), and it merely repeats the language of the provision, almost verbatim: "Each licensee is liable for all damages occasioned to the property of others through the construction or operation of his project works, and in no event is the United States to become liable therefor." 59 Cong. Rec. 245 (December 6, 1919).

### ii.    Legislative History:  Senate Origins.

The original version of the bill, S. 1419, was introduced by Mr. Shields, reported out of the Senate Commerce Committee, and passed by the Senate with the following language as part of § 4:

> **That the grantee of the permit shall be liable for all damages occasioned to the property of others** by the construction, maintenance, or operation of the dam, reservoir, or of the works appurtenant or accessory thereto, **constructed under the permit,** and in no event shall the United States be liable therefor.

*See* S. 1419, 65th Cong. 1st Sess., § 4 (Apr. 9, 1917) (emphasis added); S. Rep. No. 65-179 (Dec. 12, 1917); S. 1419, 65th Cong. 2nd Sess., § 4 (Dec. 15, 1917). No commentary was made on this provision in related Senate debate or the Senate Report accompanying the bill. However, a version of the bill was ordered printed showing changes from S. 3331 (a water power bill passed in the previous Congress), which conceived § 4 in the following manner:

> **That any such permit shall not have the effect to relieve the grantee from liability for any damage** occasioned to the property of others by the construction, maintenance, or operation of any dam or of the works appurtenant or accessory thereto, and the United States shall in no event be liable therefor.

*See*, S. 1419, 65th Cong. 1st Sess., § 4 (Dec. 13, 1917) (Ordered Printed Showing Changes from S. 3331, as Passed in 64th Congress). The changes between S. 3331 and S. 1419 demonstrate two things:

- The Senate affirmatively rejected a version of the liability provision — in S. 3331 — that reached beyond projects "constructed under the permit"; and

- By declining to explain the reasoning behind the change from S. 3331's prohibitory phrasing to S. 1491's mandatory phrasing, the Senate implied that the purpose of provision — preserving a licensee's liability under state law — remained the same

### iii.    Legislative History: House Overhaul.

After the Senate's passed S. 1419, it was referred to the House Water Power Committee. There it was re-drafted into the structure we are familiar with today, and the liability provisions of § 4 in the original bill were re-written as part of the new bill to read as follows:

> **No license hereunder shall have the effect of relieving the licensee from liabilit**y **for any injury or damage** occasioned by the construction, maintenance, or operation of said project works; and the United States shall in no event be liable therefor.

*See*, H.R. Report No. 65-715 at 6, 14, Ex. A (Jun. 28, 1918). Although the House Report accompanying the bill discussed § 803 at length, including paragraph (c)'s maintenance requirements, the liability provisions were *again* not addressed. *See id.* The House Report was silent, even though the Committee had essentially reverted the bill to S. 1331's prohibitory phrasing, again suggesting a unity of purpose focused on ensuring licensee liability for state-law damages. *See*, *DiLaura v. Power Auth. Of State of N.Y.*, 982 F.2d 73, 78 (2nd. Cir. 1992) ("A perusal of the original House version of the [FPA] bill reveals an intent to preserve existing state liability

laws[.]"); *Beaunit Corp. v. Alabama Power Co.*, 370 F. Supp. 1044, 1051 (N.D. Ala. 1973) ("[T]his Court is persuaded that it was not the legislative intent [of § 803(c)] to create a new cause of action sounding in tort, but rather to *negate the general proposition that the doing properly of that which the law itself expressly authorizes is not actionable as a nuisance*.") (emphasis added).

### iv.    Proposed Graham Amendment.

The discussion of § 803(c)'s liability provisions during the House debate on the Committee-reported bill confirms this reasoning. In the only interaction over § 803(c) in the whole debate record, Mr. Graham expressed concern that merely disclaiming the potential "relief-from-liability" effects of a license would be insufficient to ensure licensees make prompt compensation for damages to injured third parties. *See,* 56 Cong. Rec. 9913-16 (Sep. 3, 1918). Accordingly, Mr. Graham proposed an amendment that would require licensees, *before they begin construction*, to make compensation or settlement for all damages to be caused by the *construction* of their projects under state law. *See id.* Although Mr. Dempsey objected that it might be impractical to make parties settle "in advance before they can know the amount to be settled," several debate participants, including Mr. Dempsey and the bill's floor manager, Mr. Sims, agreed with Mr. Graham's goal of ensuring § 803(c) resulted in prompt compensation for third-party damages, and none questioned it. *See id.*

24

Mr. Graham's amendment was ultimately adopted in the version of S. 1419 passed by the House, which provided the following liability provisions in § 803(c):

> Each license issued hereunder shall contain an express condition that the licensee shall, before the commencement of the construction of said project works, comply with all laws of the State in which said project works or any part thereof are to be situated relative to damages that may be caused, directly or indirectly, by said proposed project works, but the United States shall not be liable for any part of said damages.

*See,* S. 1419, 65th Cong., 2nd Sess. (Sep. 4, 1918). This House-passed bill was referred to a Joint Conference Committee to resolve the differences between the House- and Senate-passed versions of S. 1.

### v.    Conference & Enactment.

The Conference Committee reported its Conference Bill to the House and Senate on Feb. 25, 1919. *See* S. 1419, 65th Cong. 2nd Sess. (Feb. 26, 1919); H.R. Rep. No. 65-1147 (Feb. 26, 1919) (Conf. Rep.). **The Conference Bill reverted § 803(c) to the mandatory language of the original Senate bill (*supra* pg. 3).** *See* H.R. Rep. No. 65-1147 at 6, 16. Unlike previous reports, the Conference Report *did* address § 803(c)'s liability provisions — only to confirm what the legislative record has hinted at all along. The reason for this change, the Conference Report said, is that "**[t]he proposed amendment accomplishes more perfectly than the language stricken**" the liability provision's original purpose of ensuring "**that the licensee**

**shall pay all damages caused to the property of others**." The final bill was enacted into law with an essentially identical version of § 803(c), providing in relevant part:

> Each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation **of the project works or the works appurtenant or accessory thereto, constructed under the license**, and in no event shall the United States be liable therefor.

*See* Public Law 280, 66th Cong. Sess. 2 (Sep. 12, 1919); S. Rep. No. 66-180 at pg. 14 (Sep. 12, 1919) (providing no commentary on liability provisions of § 803(c)).

In sum, since the FWPA's enactment, it has been the subject of numerous amendments — § 803(c) itself was amended no less than 11 times within a few decades — yet none of those amendments have modified the text of its liability provision. All of which confirms that Congress "meant what it said" and there is "no need to believe that Congress intended its words to have anything but their obvious meaning." *S.C. Public Service Auth.*, 850 F.2d at 793; *Wolverine Power Co. v. F.E.R.C.*, 963 F.2d 446, 451 (D.C. Cir. 1992). Given what the Congressional debates on the FWPA revealed about what legislators sought to accomplish with the Act and § 803(c)— an incentive for *new* water-power development[6] and a tool ensuring

---

[6] Indeed, there is nothing about imposing liability on FERC for negligent entrustment would discourage potential private operators from entering the market for developing or acquiring project based on a fear of liability, especially where the final language of § 803(c) already imposes liability on private licensees if their own negligence causes damages.

accountability in that development, respectively — this makes sense. *See* 56 Cong. Rec. 9913-16 (Sep. 3, 1918) (Mr. Graham: "There are damage suits pending there now, gentlemen, . . . in which hundreds of thousands of dollars in damages are involved . . . where the people cannot get their damages, and I do not know when they will do so, although the work has been finished for almost 10 years."); *id.* at 9109-10 (Mr. La Follette: "[W]e are trying in this bill above everything else to overcome a divided authority and pass a bill that will make it possible to get development.").

The text and legislative history are clear. Congress intended to preserve liability claims against private operators where (1) the works were constructed under a license; and (2) the operators' own actions in the course of constructing, maintaining, or operating project works caused damages. Nothing in the text or history suggests that Congress intended to exempt or render immune the federal government from a separate activity – entrustment of the project works in the first instance – which precedes and is separate from the construction, maintenance, or operation of project works. "Where means and ends sing in such harmony, the Commission's false note sounds false indeed." *S.C. Public Service Auth.*, 850 F.2d at 793.

Nothing in its legislative history suggests 10(c) was intended, or even contemplated, to create a general-purpose water-power immunity for the federal

government. In fact, "it was not the legislative intent of § 10(c)] to create a new cause of action sounding in tort, but rather to *negate the general proposition that the doing properly of that which the law itself expressly authorizes is not actionable as a nuisance*.") (emphasis added). *Beaunit Corp. v. Alabama Power Co*., 370 F.Supp. 1044, 1051 (N.D. Ala. 1973) (emphasis added).

Since the statute's enactment, it has been the subject of numerous amendments. Yet none of those amendments modified § 10(c)'s liability provision. This confirms that Congress "meant what it said" and there is "no need to believe that Congress intended its words to have anything but their obvious meaning." *S.C. Public Service Auth.*, 850 F.2d at 793; *Wolverine Power Co.*, 963 F.2d at 451. Congressional debates reveal that the legislature intended to create an incentive for *new* water-power development and a tool ensuring accountability in that development. 56 Cong. Rec. at 9109-10, 9913-16 (Sep. 3, 1918). Thus, even if the Court were to look behind the plain language and review legislative history, the result is the same. The immunity provisions of § 10(c) only apply where the dam is originally constructed under a license. These provisions do not apply where, as here, the Federal Government is negligent in its act of issuing a license to an operator to take over an already constructed facility.

II.  **But-for Defendant's act of negligent entrustment, the failure of the Edenville Dam could have been avoided, and because § 803(c) only exempts the Government from liability for actions in the "construction, maintenance, or operation" of the dam," there is nothing in § 803(c) that would provide immunity for Defendant's own independent, affirmative act of negligently entrusting the dam to Boyce.**

The failure of the Edenville Dam was not inevitable. But-for Defendant's decision to entrust the Dam to the ownership of Boyce, the disaster could have been avoided. As the District Court recognized, Defendant should have followed the mandatory pretransfer investigation and approval process before entrusting the dam to Boyce, but failed to do so:

> In a June 2020 letter to Congress, FERC Chairman Neil Chatterjee claimed that FERC never investigated Boyce's financial capacity, as Boyce "had acquired the project assets from Wolverine through a foreclosure sale, which is an exception to the . . . otherwise applicable requirement that the Commission pre-approve a transfer." See Letter from Neil Chatterjee, Chairman, FERC, to Frank Pallone, Chairman, H. Comm. on Energy and Com., at 2–3 (June 18, 2020). Chairman Chatterjee was presumably referring to 16 U.S.C. § 801, which exempts transfers by "mortgage or trust deed or judicial sale[]" from the preapproval process. But Chairman Chatterjee's explanation seems inconsistent with FERC's earlier commentary. Indeed, in its 2004 order approving the transfer, FERC seemed to state that the transfer should have been subject to preapproval:
>
> > While it appears that Synex Energy lawfully obtained (without prior Commission approval) project property and perhaps the project licenses in foreclosure proceedings, it also appears that Synex Energy's assignment of title to project property and its asserted sale of licenses to Synex Michigan required prior Commission approval. However,

29

> the record shows that the parties failed to obtain such
> approvals inadvertently.

*Wolverine Power Corp. Synex Energy Res., Ltd. Synex Mich., LLC*,
107 FERC ¶ 62,266, at p. 64,498 n.4 (2004) (emphasis added). To
date, FERC has offered no explanation for the apparent contradiction.
[R. 28, Opinion and Order, Page ID # 281].

Plaintiffs' claim in this case is not based on Defendant's acts of negligence in
the "construction, maintenance, or operation" of the Dam, which might arguably fall
within the exception of 16 U.S.C. § 803(c). Plaintiffs do not allege that Defendant
FERC's actions during the "construction, maintenance, or operation" of the Dam
caused the disaster. Instead, Plaintiffs allege that Defendant FERC's decision to
entrust the operation of the dam to Boyce, in the first instance, renders Defendant
liable for negligent entrustment under Michigan law and the FTCA. (R. 1, Complaint
¶¶ 51-68, Page ID #15-19).

The language of § 803(c) only exempts from liability acts taken in the course
of "construction, maintenance, or operation." 16 U.S.C. § 803(c). The statute does
not exempt acts of "entrustment." Thus, there is a basis for construing § 803(c) as
exempting a claim for negligent "entrustment."

Citing *Skokomish Indian Tribe v. United States*, 410 F.3d 506, 512 (9th
Cir.)(en banc), the District Court found that the language of § 803(c) clearly and
unequivocally provides that licensees, and not the Government, shall be liable for
damages arising out of the construction, maintenance, or operation of a dam. (R. 28,

Opinion and Order, Page ID # 303). This finding is erroneous because in *Skokomish*, the Ninth Circuit did not consider the adjective clause "constructed under the license." Nor did the Ninth Circuit consider the extent to which the clause affects the scope of the liability exemption. Moreover, even if § 803(c) allocates liability for damages caused by acts of "construction, maintenance, or operation" to licensees, it does not allocate liability for entrustment of the project by the Government to the licensee. Thus, there is no basis in the text of § 803(c) to bar Plaintiff's negligent entrustment claim, which is brought against the Government for its own affirmative act of negligently entrusting the dam to Boyce. Defendant is therefore not entitled to sovereign immunity from Plaintiffs' negligent entrustment claim, and no further analysis or construction of the statutory language or history is required.

**III.    The District Court erred in its application of canons of interpretation, and a plain and grammatically proper interpretation of the statute requires the conclusion that Defendant is not exempt from Plaintiffs' claims.**

In dismissing Plaintiff's Complaint, the District Court concluded that it was required to "look to the familiar canons of statutory construction" to resolve the question of whether "the exemption [of §803(c)] extends to the Edenville Dam. (R. 20, Opinion and Order, Page ID # 159-65). As noted above, canons of interpretation, like legislative history, should only be resorted to after grammatical and definitional analysis of the statute demonstrates that it's susceptible to more than one reasonable

interpretation. *See, e.g., Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992).  Here, the meaning of the statute is plain without resorting to canons of interpretation and the District Court erred in resorting to any canons of interpretation in its analysis.

The District Court also erred when it framed the issue of construction such that the "rule of the last antecedent" is *the* general rule, and the presence of a comma supposedly creates an "exception" to it. ECF No. 28, PageID.293-94. This framing is erroneous. Statutes must be interpreted in accordance with the general rules of English grammar and usage. As the *Duguid* court and others cited in that case correctly point out, it is a mistake to interpret a modifier clause that follows an "integrated clause," composed of a series of objects, to modify only one of those objects. *Facebook Inc. v. Duguid*, 141 S. Ct. 1163 (2021).

The District Court further stated that "[t]he Supreme Court has long warned that 'a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning.'" ECF No. 28, PageID.294 (citing *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993)). But here, the proper grammatical construction of the statute is based on much more than just the placement of a comma. The term "constructed under the license" is a dependent (or subordinate) clause because it cannot stand alone as a sentence. *Webster's New World English Grammar Handbook* 222 (2d ed.

2009). It is an adjective clause because, like a single-word adjective, it modifies the nouns preceding it (construction, maintenance, operation) by describing or limiting them. *Id*. at 86, 222. Adjective clauses are placed right after the noun (or nouns) it modifies so that it is clear what is being modified. The Princeton Review, *Grammar Smart: A Guide to Perfect Usage* 66 (2d ed. 2001). *Cf. Webster's Grammar Handbook* at 102 ("misplaced modifiers" are those located in places other than near the words they modify and that seem to modify words other than those they are intended to modify). Adjective clauses are usually introduced with a relative pronoun, but the pronoun may be omitted and implicitly understood. *Webster's Grammar Handbook* at 222. The omitted relative pronoun in the statute is "that," since the natural way to read the text is that *each licensee hereunder shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto [that are] constructed under the license, and in no event shall the United States be liable therefor.* In other words, the adjective clause "constructed under the license" modifies the list of nouns preceding it ("construction, maintenance, or operation") because the clause limits and makes more definite what kinds of actions (specifically "construction, maintenance, or operation") for which the licensee is liable. Further, the clause is appropriately placed right after the nouns it is modifying. There are no additional words between

the list of nouns being modified and the adjective clause. Thus, it is clear that the legislature's choice and placement of the adjective clause was intended to restrict the instances in which license holders could be held liable.

The Supreme Court confirmed these canons of interpretation in *Duguid*, holding that "[u]nder conventional rules of grammar, [w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series,' a modifier at the end of the list 'normally applies to the entire series.' The Court often applies this interpretative rule, usually referred to as the 'series-qualifier canon.' *Duguid*, 141 S. Ct. 1163, 1169 (2021) (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012) (quotation modified in *Duguid*). The Court further held that this specific canon is helpful because it "generally reflects the most natural reading of a sentence." *Id*. Furthermore, to the extent that the meaning of the adjective clause "constructed under the license" turns in part on the placement of the comma preceding the adjective clause, such punctuation is a crucial indicator of meaning, like any other grammatical element. *Id*. (quoting W. Eskridge, *Interpreting Law: A Primer on How to Read Statutes and the Constitution* 67–68 (2016); see also 2A N. Singer & S. Singer, *Sutherland Statutes and Statutory Construction* § 47:33, pp. 499–500 (rev. 7th ed. 2014); Scalia & Garner 161–162. ("As several leading treatises explain, '[a] qualifying phrase separated from

antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one.'"

In granting Defendant's motion to dismiss, the District Court further stated that "[t]he Supreme Court's admonition seems especially salient here, given that Sutherland's comma rule would produce strange inconsistencies in the statute." R. 18, Opinion and Order, Page ID # 294. This specific focus on the comma in the § 803(c) is mistaken, however, because Plaintiffs do not simply mechanically interpret the usage of similar grammatical construction as -- or even the usage of similar language -- to mean the same thing across different parts of a statute. *See, Atlantic Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932) (setting out multi-factor test for determining whether same words in different parts of statute mean the same thing). Instead, similar to the statute at issue in *Duguid*, the meaning of § 803(c) is clear because its own grammar and language is clear, regardless of any similarities or differences between it and other statutory language. Thus, reading § 803(c) (including its comma) in the natural way would not require the Court to apply the same reading to another part of the statute or result in "inconsistencies" across different statutes. In other words, in this case, the comma in § 803(c) "further suggest that Congress intended the phrase ["constructed under the license"] to apply equally to both preceding elements." *Duguid*, 141 S.Ct. at 1170.

The District Court also held that "Plaintiffs' reading would make the licensee solely responsible for safety but conditionally responsible for damages, with liability turning on whether the project works happened to be constructed under the license." R. 28, Opinion and Order, Page ID # 295. But the language, purpose, and context of § 803(c) demonstrates that this conclusion is mistaken. The FPA preempts the field of waterpower regulation within FERC's jurisdiction, generally making dam operators immune against state negligence claims when they comply with FERC safety regulations. *See, Simmons v. Sabine River Auth. Louisiana*, 732 F.3d 469, 477 (5th Cir. 2013). The opposite is also true: when dam operators do not comply with FERC regulations, the FPA would not preempt state-law claims against them, with or without § 803(c). But when a project or its appurtenances are "constructed under the license," then the very existence of the project, along with all of the operator's plans and actions in its construction, maintenance, and operation, could be said to be sanctioned by FERC through the issuance of the license. Only in this context does the statute's allocation of liability to the operator add anything to the statutory scheme -- hence why that allocation is made to apply solely to projects and appurtenances "constructed under the license."

Against this background, there is no reason to conclude that Plaintiffs' interpretation would create "conditional responsibility for damages." If an operator does not comply with FERC regulations, they are subject to FERC fines,

36

investigations, take-overs, etc., *in addition to* all available state law claims. If an operator does comply with FERC regulations and damages arise from conduct within the scope of FERC regulations, the operator would be protected. *See, Simmons*, *supra*. If an operator's conduct falls outside the scope of FERC regulations, they would not be subject to FERC fines and other sanctions. There is no reason to conclude that operators would be immune from liability for state law claims based on Section 10(c) when they were not within the scope of the FPA at all.

Rep. Graham's comments make it clear that in crafting the statute, Congress was focused on damages arising from the construction of new dams under licenses from the United States, and on preventing builders of new dams from using their license as a bar to liability claims. *See,* 56 Cong. Rec. 9913-16 (Sep. 3, 1918). Hence why the statute allows for claims against licensed operators for damages arising from construction, maintenance, or operation of licensed dams, while seeking to encourage potential operators to obtain licenses and undertake projects that are socially and economically beneficial. The adjective clause "constructed under the license" achieves this balance by clarifying that operators may liable where their acts of construction, maintenance, or operation of a licensed project cause damages, but only when the project was "constructed under a license," and not when the project was not "constructed under a license."

Similarly, the District Court erred in rejecting the last antecedent rule and the series-qualifier canon on the basis of a lack of "constructed under the license" language in other sections of the FPA, where those sections involve take-overs and repossessions by FERC.  R. 28, Opinion and Order, Page ID #295. As discussed above, and as the extensive legislative history proves, the issue of allocating damages liability to private operators, which is addressed through § 803(c), is quite distinct from take-overs and repossessions by FERC, which simply do not present the same concerns about preemption that §803(c) addresses. Thus, the adjective clause is necessary to clarify the meaning of §803(c), but not the take-over and repossession provisions of the law.

Furthermore, even if these three provisions were all the same type of provision, it would still make little sense for the Court to reject one reasonable interpretation of §803(c) over another simply because it would make §803(c) different from those other provisions. While it is proper to analyze the words at issue in the context of the statute as a whole to ensure its construction of the words is "coherent and consistent" with the statute's other provisions and overall scheme, See, e.g., *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 222 (2008), typically that analysis focuses on avoiding interpretations that would: (1) contradict, make unworkable, or undermine other provisions of the statute, See, e.g., *Arizona v. Inter-Tribal Council of Arizona, Inc.*, 133 S.Ct. at 2255-56 (rejecting a reading of the

NVRA requirement that States "accept and use" a federal voter registration form pursuant to which "the Federal Form ceases to perform any meaningful function" in the NVRA scheme); or (2) have implications outside the scope of what Congress was "thinking about" when it created the statute.  See, e.g., *Demarest v. Manspeaker*, 498 U.S. 184, 185 (1991) (finding plain meaning of witness-fee provision mandating payment of witness fees to incarcerated witnesses in habeas trials not absurd where other provisions in statute explicitly denied payments to prisoners, which showed that "Congress was thinking about incarcerated individuals when it drafted the statute"). In other words, it is improper to selectively rely upon differences in the language of various provisions unless the differences in language create a functional problem with the interpretation. In this case, §803(c) deals with different policy concerns than the take-over and repossession provision, and Plaintiffs' interpretation of §803(c) is consistent with those concerns.

The District Court further found that both Plaintiff's and Defendant's interpretations would equally lead to redundancy, but that is not true.  R. 28, Opinion and Order, Page ID # 296-297. As Rep Graham's comments make clear, one primary focus of Congress in enacting § 803(c) was to ensure that operators would be held liable for damages arising from the initial construction of a dam, where the dam was constructed under a license. If the noun "construction" were removed from the list of causes of damages covered by §803(c), then the operator would only be

responsible for damages arising from the operation and maintenance of the dam, but not for damages arising from its initial construction. Only by reading the adjective clause "constructed under the license" to modify all of the activities is the full purpose of the statute achieved.

The District Court cited the Conference Report as evidence that Congress "likely intended for the Government's exemption to include all project works covered by the license, regardless of when they were constructed." R. 28, Opinion and Order, Page ID # 300. But as the legislative history makes clear, Congress went back and forth between versions of the bill that contained the "constructed under the license" limitations and versions that did not. In each case, Congress returned the language that limited the scope of § 803(c)'s liability exemption to project works "constructed under the license." The Conference Committee Report, which states that §803(c) is intended to "provide that licensee shall pay all damages caused to the property of others," is perfectly consistent with the policy justifications described above: Congress was concerned that, in the case of new dam that is constructed under a license, the FPC's degree of involvement in those projects would effectively immunize private operators from state law claims (including claims arising from the initial construction of the dams). Section 803(c) is designed and intended to ensure that licensees "pay all damages caused to the property of others" in that specific

40

context, i.e., to clarify that where the project was "constructed under the license," the private operator is still liable.

The District Court found that Plaintiffs' reading of the statute is "unwarranted as a matter of both economics and history" because it is inconsistent with the legislative purpose to incentivize new water-power development while ensuring accountability in that development. R. 28, Opinion and Order, Page ID # 301. As discussed above, however, the adjectival clause "constructed under the license" balances Congress's competing goals of incentive and accountability. And in crafting § 803(c), as in crafting the rest of the FPC, Congress was chiefly concerned with the licensing of new water-power projects. It was not concerned with, nor did it consider, what would happen to state-law claims if the FPC took over the licensing and regulation of (what would then have been considered) a state-jurisdiction project like the Edenville dam.

In fact, Congressional debates show the bill's sponsors taking pains to explain how the FPA would *not* affect state-jurisdiction projects in any way. Congress was concerned only with creating a framework for hydro-power projects on navigable/interstate waterways. The concept of the FPC taking over the regulation of existing dams from the states seems to only have come about with the New Deal and the expansion of Congress's authority under the Commerce Clause in the 1930s. Given the fact that, under the original statute, the FPC was expected to be primarily

41

and perhaps exclusively) focused on issuing licenses for new projects, Congress wrote § 803(c)'s liability provisions to ensure that, when the FPC licensed a new project (and in the process, approved the plans for its construction, maintenance, and operation), the operator of the project would (a) still have to compensate people for injuries arising from the project; and (b) the government would not be liable for such damages as a guarantor of the project. Plaintiffs' construction of the statute, including the "constructed under the license clause," advances both of those objectives. The fact that no provision of the legislative history/statutory text suggests Congress was ever "thinking about" the FPC taking over regulation of dams first built on waterways under exclusive state jurisdiction at the time, that history further supports Plaintiffs' interpretation. Cf. *Green v. Bock Laundry Machine Company*, 490 U.S. 504, 527 (1989) (Scalia, J. concurring) (rejecting one of two possible textual interpretations as "bizarre" on ground that the interpretation was nowhere to be found in the legislative history).

Finally, the District Court cited *Pac. Gas & Elec. Co. (PG&E) v. FERC*, 720 F.2d 78, 87 (D.C. Cir. 1983) and *Pike Rapids Power Co. v. Minneapolis, St. Paul & Sault St. Marie Ry.*, 99 F.2d 902, 912 (8th Cir. 1938), for the premise that § 803(c) plainly ensures that only licensees, and not the United States, will be liable for damages. R. 28, Opinion and Order, Page ID # 303. But because the projects in those cases were constructed under a license, there was no reason for the parties or the

courts to address whether the scope of tort liability would have been affected by the limitation of the adjectival clause "constructed under the license." In this case, unlike *PG&E* and *Pike Rapids*, the project was not "constructed under the license," and therefore the liability exemption of § 803(c) do not apply.

## CONCLUSION AND RELIEF REQUESTED

The text and legislative history of § 803(c) confirm that the United States does not have sovereign immunity when it is independently negligent in its affirmative act of entrusting the operation of a dam to an operator to take over an already constructed facility. Nor is the Government exempt from liability where the dam at issue was not constructed under a license. This Court should reverse the judgment of the District Court and remand this case for further proceedings.

Respectfully submitted,

PITT, MCGEHEE, PALMER, BONANNI & RIVERS, P.C.

By: */s/ Beth M. Rivers*
Beth M. Rivers (P33614)
Megan A. Bonanni (P52079)
Kevin M. Carlson (P67704)
Robert W. Palmer (P31704)
Michael L. Pitt (P24429)
PITT, MCGEHEE, PALMER,
BONANNI & RIVERS, P.C.
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
brivers@pittlawpc.com

Date:  December 9, 2022

## CERTIFICATE OF COMPLIANCE

I hereby certify that the Appeal Brief of Plaintiffs-Appellants complies with FRAP 32(a)(7) because it consists of 11,084 words of monospaced typeface, including all headings, footnotes, and quotations.

Respectfully submitted,

PITT, MCGEHEE, PALMER, BONANNI & RIVERS, P.C.

By: */s/ Beth M. Rivers*
Beth M. Rivers (P33614)
Megan A. Bonanni (P52079)
Kevin M. Carlson (P67704)
Robert W. Palmer (P31704)
Michael L. Pitt (P24429)
PITT, MCGEHEE, PALMER, BONANNI & RIVERS, P.C.
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
brivers@pittlawpc.com

Date: December 9, 2022

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 9th day of December, 2022, the foregoing document was filed using the Court's CM/ECF electronic filing system which will provide electronic notice of this filing to all counsel of record.

*s/ Julie A. Nardone*
Julie A. Nardone
Legal Assistant